# EXHIBIT A

R. Scott Erlewine, State Bar No. 095106
Michael D. Levinson, State Bar No. 271566
PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP
39 Mesa Street, Suite 201 – The Presidio
San Francisco, CA   94129
Tel: 415-398-0900
Fax: 415-398-0911
Email: rse@phillaw.com
             mdl@phillaw.com

Attorneys for Plaintiff

**SUPERIOR COURT OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

| | |
|---|---|
| JOHNATHAN "MAC" WILLIAMSON, an individual,<br><br>Plaintiff,<br><br>v.<br><br>CHINA BASIN BALLPARK COMPANY LLC, a Delaware Limited Liability Company, and DOES 1 through 20, inclusive,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR PREMISES LIABILITY AND NEGLIGENCE**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff alleges:

**INTRODUCTION**

1.  Plaintiff JOHNATHAN "MAC" WILLIAMSON ("Plaintiff") is a professional baseball player, who played for the San Francisco Giants. In April 2018, Plaintiff was one of the best power hitters in Major League Baseball ("MLB"). On April 24, 2018, Plaintiff was seriously injured when he crashed over an on-field bullpen mound and collided headfirst into the left field line wall while running to catch a fly ball at Oracle Park (then AT&T Park) ("Park") in San Francisco. Plaintiff seeks to recover damages arising from his concussion-related injuries.

2. These injuries never should have occurred. Defendant CHINA BASIN BALLPARK COMPANY LLC (individually and collectively with DOES 1-20, and each of them, "CBBC") knew or should have known when it designed the Park that on-field bullpens (especially when located near a wall) presented an unreasonable and unnecessary risk of harm to baseball players but proceeded to incorporate them anyway. Thereafter, despite knowledge of numerous instances of players having fallen over these bullpen mounds, CBBC failed to move the bullpens off the field of play to protect players. It was not until after Plaintiff was seriously injured that CBBC finally took steps to move the bullpens behind the outfield wall where they belonged.

**PARTIES**

3. Plaintiff is a resident of North Carolina.

4. CBBC is a Delaware limited liability company, having its principal place of business in San Francisco, California.

5. The true names or capacities, whether individual, corporate, associate, or otherwise, of defendants DOES 1 through 20, inclusive, being unknown, Plaintiff asserts his claims against these defendants under fictitious names pursuant to Code of Civil Procedure § 474. Plaintiff will amend the Complaint to state such DOE defendants' true names once they are ascertained.

6. Plaintiff is informed and believes, and thereon alleges, that each defendant named in this Complaint, and each Doe defendant, is in some manner responsible for the wrongs and damages alleged below, and in so acting was functioning, at all relevant times, as the agent, servant, partner, alter ego and/or employee of the other defendants, and in doing the actions described below, was acting within the course and scope of his, her or its authority as such agent, servant, partner and/or employee with the permission and consent of each of the other defendants. All acts herein alleged were approved of and ratified by each and every other defendant.

**JURISDICTION AND VENUE**

7. Jurisdiction and venue are proper in this Court because the conduct described herein, and the resulting harm suffered by Plaintiff, occurred within the City and County of San Francisco, and Defendant CBBC's principal place of business is within the City and County of San Francisco.

**FACTS**

**The Park**

8. In the mid-1990s, the voters of San Francisco authorized the building of the Park – a new downtown sports and outdoor events venue in San Francisco. On information and belief, CBBC at all times relevant owned, operated, controlled, possessed, leased, managed, maintained, and was involved in the design of, the Park.

9. The construction of the Park (which cost more than $357 million) was privately financed by CBBC. On information and belief, as part of the financing, CBBC sold personal Charter Seat Licenses, which permitted the holder to purchase tickets for a specific seat to the variety of events held at the Park, both baseball and non-baseball related.

10. On information and belief, CBBC signed a 66-year lease for the land with the Port of San Francisco. According to the term sheet for the lease, "CBBC shall be responsible for all costs of constructing and operating the ballpark project."

11. The Giants at all times relevant played their home games at the Park.

12. CBBC's purpose was to operate the Park for multiuse purposes. In addition to Giants games, the Park has hosted numerous football games (including, e.g., an annual college football bowl game (2002-13), home to the XFL's San Francisco Demons (2001), home of the annual East-West Shrine Game (until 2006), and interim home for Cal's football team (2011)), professional soccer matches, the AMA Supercross Championship (2003-11), numerous concerts (2001-19), and even Kanye West's proposal to Kim Kardashian (2013).

13. In designing the Park, CBBC decided to include on-field bullpens when used for baseball games.

14. It has long been known that bullpen mounds on the field of play create an unreasonable risk of harm. For instance, in 1977, Baltimore Orioles' manager Earl Weaver famously had his team forfeit a game in Toronto during a pennant race due to safety concerns with the on-field bullpen mounds.

15. Prior to building the Park, CBBC knew, or at a minimum should have known, that placing bullpens on the field of play was a safety hazard for players. But as the late Peter Magowan, who was Chairman and CEO of CBBC at the time, stated: "We wanted all the seats to face the pitcher, like at Wrigley and at Seals Stadium. We wanted bullpens on the field, like in Wrigley. Wrigley Field was built in 1912 but it had it all: great seats, seats that faced the pitcher, quirky features."

16. To make matters worse, CBBC located the on-field bullpen mounds so that they were abutting the left field line and right field line walls, increasing the risk that a player who fell over either mound would collide with the wall and be seriously injured. CBBC also failed to incorporate any safety features, such as a warning track around the mounds like there are in front of the outfield walls. On information and belief, the bullpen mounds at the Park were also higher than normal pitcher's mounds.

17. Baseball as a whole recognized the safety hazard: In 1989, there were 15 MLB parks that had on-field bullpens; by 2000, there were only eight; and by 2018, CBBC was one of only three parks. With the exception of San Diego's Petco Park (built in 2004), Oracle Park was the last park designed with on-field bullpens. (In 2012, Petco Park moved its one on-field bullpen to behind the outfield wall mostly for player safety issues.)

18. Consistent with this trend, the Chicago Cubs moved the on-field bullpens at Wrigley Field (which opened in 1914 and is the second oldest ballpark in Major League Baseball) following the 2016 season due to player safety concerns.

19. Even after the Park was completed in 2000, CBBC was repeatedly put on notice of the bullpen mound safety hazard each time a player fell over it. Examples prior to Plaintiff's collision include:

- In 2014, Toronto Blue Jays left fielder Michael Saunders falling over the bullpen mound while chasing a fly ball and the ball hitting him in the head;

- In 2016, Washington Nationals right fielder Bryce Harper falling over the right field bullpen mound while making a catch;

- In 2016, the Giants' own Hunter Pence falling over the right field bullpen mound and making a catch while flat on his back;

- In 2017, Colorado Rockies left fielder Stephen Cardullo falling over the left field bullpen mound after making a running catch;

- In 2017, the Giants' own Eduardo Nunez stumbling over the left field bullpen mound while making a catch.

20. Despite these multiple red-flag warnings, and in conscious disregard of player safety, CBBC failed to eliminate the on-field bullpens at the Park or take any steps to minimize the risk of injury posed by them.

**The Collision**

21. The Giants selected Plaintiff in the third round of the 2012 MLB draft. After working his way up the minors as one of the Giants' top outfield prospects and being out for a year due to surgery, Plaintiff made his MLB debut in 2015. Over the next two seasons, Plaintiff split time between the Giants and their Triple-A affiliate in Sacramento.

22. Toward the end of the 2017 season, Plaintiff sought out the services of Doug Latta, one of the foremost hitting instructors in the game today, known throughout baseball as "the swing whisperer." Mr. Latta has helped remold numerous MLB players (many late in their careers) into All-Stars.

23. Mr. Latta dramatically transformed Plaintiff's swing and the results were immediate and profound. After continuing to work with Mr. Latta in the offseason, Plaintiff emerged in spring training as one of the best hitters in baseball. Due to a crowded roster of veteran outfielders, the Giants did not immediately call him up to play. However, after Plaintiff started the year hitting .487 in Triple-A, on April 20, 2018 the Giants promoted him back to the big leagues. During the first five games back with the Giants, Plaintiff hit .316 with three home runs.

24. On the fateful day of April 24, 2018, the Giants were playing the Washington Nationals at Oracle Park. Plaintiff went 2-for-4 at the plate. In the fifth inning, with the score tied 3-3, he chased a fly ball heading down the left field foul line, running over 100 feet at a full sprint in an attempt to make the catch and get his team out of the inning. Plaintiff was tracking the ball the entire time it was in the air and unable to look down. As he crossed into foul territory, he crashed over the bullpen mound just as he was about to make the catch, colliding violently headfirst with the left field line wall without the ability to brace himself.



25. Plaintiff immediately clutched his head with both hands and laid on the ground stunned, dazed, and confused. The impact was so strong that fans seated in the area and the hitter all grimaced in horror.

26. Beginning that evening, Plaintiff started feeling groggy. The following day, he also began feeling dizzy, disoriented, and nauseous. The Giants put him through the concussion protocol, which he failed. As a result, he was placed on the 7-day concussion injured list.

27. Following a rehab assignment, the Giants recalled Plaintiff in late May. Based upon his pre-injury performance, Plaintiff was promoted to starting left fielder for the Giants, relegating three-time All-Star Hunter Pence to the bench. Unfortunately, with his post-

concussion symptoms continuing, Plaintiff was unable to return to form and his numbers were poor. As a result, in late June, the Giants optioned Plaintiff to Triple-A, where he continued to struggle with vision problems, nausea and fatigue. When Plaintiff's symptoms continued throughout the summer, he was again diagnosed with post-concussion syndrome and took off the rest of the season to rehab. Thereafter, even though many of Plaintiff's symptoms had dissipated, he continued to experience vision problems, bouts of vertigo-like symptoms, motion sickness, and other symptoms as well.

28. The concussion caused a steep decline in Plaintiff's performance level and effectively ended Plaintiff's Major League Baseball career.

### The Aftermath

29. Meanwhile, on June 3, 2018 – six weeks after Plaintiff's collision and resulting concussion – the Giants hosted their annual "Until There's A Cure Day." While the players were on the field before the game participating in the event, Mr. Magowan, who helped design the field on behalf of CBBC, apologized to Plaintiff for the collision and said he felt responsible for his injuries as well as other injuries due to the on-field bullpen mounds since the Park opened in 2000.

30. Despite Plaintiff's collision in 2018, numerous other prior incidents, and Mr. Magowan's apology, CBBC still failed to move the on-field bullpens after the 2018 season. Such inaction led to the Giants' Steven Duggar falling over the right field bullpen mound and injuring his wrist in April 2019, almost exactly a year after Plaintiff's crash. San Diego Padres outfielder Wil Myers and Dodgers outfielder Chris Taylor also fell over the same mound in 2019.

31. In response to Mr. Duggar's injury, then Giants' Manager Bruce Bochy remarked: "***It's dangerous. These guys are focused on catching the ball. They're running full speed. It was a scary moment, to be honest***." (emphasis added). Giants' broadcaster Mike Krukow took it a step further and told the Giants' flagship radio station KNBR: "Oh I was angry. I was hot about it. We all were. We saw a horrific injury last year with what happened to Mac Williamson."

PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP
39 Mesa Street, Suite 201
San Francisco, CA  94129
(415) 398-0900

32. The Giants' *own players* even acknowledged the unnecessary risk they regularly faced by having the bullpens on the field:

- "Getting the bullpens off the field would be a great thing. **For 10 years, I've seen guys face plant going down the line** . . . . It's just not smart to me to have the bullpens right there by the foul line. If the bullpens went to right center, I personally would not be opposed to it." Buster Posey, Catcher (emphasis added)

- *"I've seen people get hurt and for me, it's just a matter of time before we see a more serious injury.* So I think it's probably a good idea to move those out of the way. And if it changes the dimensions … well, obviously, it's not gonna get any worse." Brandon Belt, First Baseman (emphasis added)

- "We saw it with [Plaintiff Mac Williamson] last year. **It can be a safety hazard.** I think Triples Alley would be a reasonable place to put it." Brandon Crawford, Shortstop (emphasis added)

33. In an interview with *The Sporting News* in 2019, former Giants second baseman Scooter Gennett was asked what his favorite memory of Oracle Park was prior to joining the team in a trade that year. In response, he retorted: "Well it's definitely not running after a fly ball in foul territory, tripping on the bullpen mound and the ball hitting the backside of my glove." In that same article, a Nationals relief pitcher opined: "You see some of these guys go over there and it gets pretty ugly. It just seems like an unnecessary risk."

34. Other players echoed similar concerns. Following his fall over the bullpen mound at the Park, Mr. Taylor said: "It would be nice if they got a bullpen like everyone else, behind the outfield." His teammate and three-time Cy Young award-winner Clayton Kershaw went a step further and exclaimed: "Let's clean it up out here. It's a brand-new ballpark, or relatively new. *So they should have thought about it.*" (emphasis added).

35. Immediately after Mr. Cardullo fell over the bullpen mound, the Rockies' television announcers and former major league players Jeff Huson and Ryan Spilborghs vented: "That's why you just flat hate that the mounds are in play. ***This is dangerous, you want to lose a player who's making a semi-routine play in foul ground?***" (emphasis added).

36. Following the 2019 season, CBBC *finally* moved the bullpens to behind the outfield wall.

# FIRST CAUSE OF ACTION

## Premises Liability

37. Plaintiff realleges and incorporates by reference each and every allegation stated above.

38. As the entity that at all times relevant owned, operated, controlled, possessed, managed, leased, maintained, and helped design the Park, CBBC, as such, had a duty to exercise ordinary care to avoid exposing players to an unreasonable risk of harm. CBBC both knowingly and negligently violated that duty by including on-field bullpens, especially after having been warned that they were a safety hazard to players, thus making any resulting injuries obviously foreseeable. CBBC failed to heed that duty both when designing and building the Park.

39. CBBC further breached that duty by failing to eliminate the hazard, despite knowing of numerous instances of players falling over the on-field bullpen mounds in the years before Plaintiff's injuries.

40. In further breach of its duty, CBBC also increased the risk of a player getting injured by jamming the mounds just inches from the foul lines on one side and abutting the left field line and right field line walls on the other side, leaving hardly any room for a player to break his fall or to avoid hitting the wall. Additionally, CBBC failed to implement a warning signal of any type to alert players as to the on-field bullpen mounds when they were running full speed while looking up to track the ball. The rest of the first and third baselines and the area in the outfield parallel to the wall all have a warning track (a flat dirt area approximately 10 feet wide designed to alert the player to an oncoming wall).

//

//

//

//



41. In doing the things described above, CBBC failed to exercise ordinary care to avoid exposing players, such as Plaintiff, to an unreasonable risk of harm, particularly given the high probability and foreseeability of injury.

42. CBBC has moral blame given it opted for fan experience over player safety.

43. The bullpen mounds were not an open and obvious condition to a player chasing down a fly ball. Further, this dangerous condition was unavoidable.

44. As a direct result of the conduct described above, Plaintiff suffered damages in the form of lost wages, medical expenses, loss of future earnings, and pain and suffering in an amount according to proof but exceeding the jurisdictional minimum of this Court.

45. CBBC's acts described herein were malicious and oppressive. At all relevant times herein, CBBC acted willfully and with conscious disregard for Plaintiff's safety as well as the safety of other players. Further, CBBC's conduct subjected Plaintiff to cruel and unjust hardship in conscious disregard of his rights. Plaintiff is therefore entitled to punitive damages against CBBC in an amount appropriate to punish it and set an example.

//

//

## SECOND CAUSE OF ACTION

### Negligence

46. Plaintiff realleges and incorporates by reference each and every allegation stated above.

47. CBBC owed a duty of due care to Plaintiff but negligently violated this duty by the conduct described above.

48. As a direct result of the conduct described above, Plaintiff suffered damages in the form of lost wages, medical expenses, loss of future earnings, and pain and suffering in an amount according to proof but exceeding the jurisdictional minimum of this Court.

49. CBBC's acts described herein were malicious and oppressive. At all relevant times herein, CBBC acted willfully and with conscious disregard for Plaintiff's safety as well as the safety of other players. Further, CBBC's conduct subjected Plaintiff to cruel and unjust hardship in conscious disregard of his rights. Plaintiff is therefore entitled to punitive damages against CBBC in an amount appropriate to punish it and set an example.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

1. For compensatory damages, according to proof but at least the jurisdictional minimum;
2. For punitive and exemplary damages;
3. For pre-judgment interest, at the legal rate;
4. For costs of suit; and
5. For all such other and further relief as the Court may deem just, proper, and equitable.

Dated: November 10, 2020

PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP

By: _____
R. Scott Erlewine
Michael D. Levinson
Attorneys for Plaintiff

11
COMPLAINT FOR DAMAGES

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: November 10, 2020          PHILLIPS, ERLEWINE, GIVEN & CARLIN LLP

By: _____
    R. Scott Erlewine
    Michael D. Levinson
    Attorneys for Plaintiff